UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID STAVROPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 1946 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**M<u>EMORANDUM</u> O<u>PINION AND</u> O<u>RDER</u>**

David Stavropoulos brought this suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*., alleging that a Transportation Security Agency ("TSA") officer negligently injured him during a pat-down search at O'Hare International Airport on March 8, 2017. Doc. 1. The court held a bench trial. Docs. 154-157, 166. Pursuant to Civil Rule 52(a), the court enters the following Findings of Fact and Conclusions of Law. The Findings of Fact rest on the court's evaluation of the exhibits (both documentary and video) and witness testimony; unless otherwise noted, if the court cites witness testimony to support a factual finding on a particular matter, the court found that testimony credible. To the extent that any Findings of Fact may be considered Conclusions of Law, they shall be deemed Conclusions of Law, and vice versa. After carefully considering the evidence and assessing the witnesses' credibility, the court finds that Stavropoulos has failed to show by a preponderance of evidence that his complained-of injuries were proximately caused by anything that happened during the pat-down search. Accordingly, the court enters judgment in favor of the United States.

1

**Findings of Fact**

A.   **The Plaintiff**

1. On March 8, 2017, Stavropoulos was 58 years old. Trial Tr. at 33 (Stavropoulos testimony); Pl. Exh. 3 at 3.

2. Prior to March 8, 2017, Stavropoulos led an active lifestyle. He ran six to eight miles four times a week, played tennis several times a month, and biked several times a week. Trial Tr. at 32-33 (Stavropoulos testimony).

3. Stavropoulos is the sole member of an LLC that buys and sells excess inventory, including electronics and medical supplies. *Id*. at 32.

4. At the time of the incident, Stavropoulos was enrolled in his first year of law school. *Id*. at 31, 77. On the date of the incident, he was preparing for a torts exam and had law books in his carry-on bag. *Id*. at 46, 77.

5. About thirty years before the incident, Stavropoulos had surgery on his right testicle. *Id*. at 79-80 (Stavropoulos testimony); *id*. at 445 (Nadler testimony).

B.   **The Checkpoint**

6. The TSA operates security checkpoints at O'Hare Airport. *Id*. at 103-04 (Capone testimony).

7. Procedures at TSA checkpoints are governed by the TSA's Standard Operating Procedures ("SOP") manual. *Id*. at 104-05; *id*. at 176-77 (Baker testimony); *id*. at 225 (Pickens testimony); Pl. Exh. 1 at 4.

8. Passengers are sometimes required to pass through an Advanced Imaging Technology full-body scanner ("AIT") at a TSA security checkpoint. Trial Tr. at 115 (Capone testimony); *id*. at 281 (Spinden testimony); Pl. Exh. 1 at 6-11. The purpose of the AIT is to detect nonmetallic objects hidden on a passenger's body. Trial Tr. at 281 (Spinden testimony).

9. When a passenger steps into the AIT, the transportation security officer ("TSO") presses a button on a monitor screen to indicate the passenger's gender. *Id*. at 137 (Capone testimony); Pl. Exh. 1 at 8. After the scan, the screen turns green if there is no anomaly. Trial Tr. at 137 (Capone testimony); Pl. Exh. 1 at 9. If there is an anomaly, a red bar appears and the anomaly's location is indicated. Trial Tr. at 137 (Capone testimony); Pl. Exh. 1 at 9.

10. If the monitor shows an anomaly, that anomaly must be cleared through a pat-down of the passenger. Trial Tr. at 105-06 (Capone testimony); Pl. Exh. 1 at 9-10.

11. The SOP manual instructs TSOs to give certain advisements to a passenger before conducting a pat-down. Trial Tr. at 107 (Capone testimony); Pl. Exh. 1 at 14-15. When the TSO pats down a sensitive area of the passenger's body, the advisements include: (1) that the passenger should "maintain visual sight of [his] accessible property"; (2) that there is a "need to conduct a search"; (3) that there is a need to touch a sensitive area of the body; (4) an indication "when the front or … back of the hand will be used" in touching the sensitive area; and (5) a "hands-off demonstration" of the procedure for touching the sensitive area. Pl. Exh. 1 at 14. Additionally, the TSO is supposed to ask the passenger whether he prefers a private screening, whether he can stand unassisted for four minutes, and whether any areas of his body are "sensitive or painful to the touch." *Ibid*.

12. If the monitor shows an anomaly in a male passenger's groin area, the TSO is supposed to search the passenger's lower body in the following sequence: the back of the waistband from seam to seam; the buttocks area; the legs; the front of the waistband; and then the groin area. Trial Tr. at 107-10 (Capone testimony); Pl. Exh. 1 at 17-19.

3

13. It is not unusual for the TSO will make incidental contact with a male passenger's genitals during a pat-down of the passenger's legs. Trial Tr. at 147 (Capone testimony); *id*. at 286 (Spinden testimony).

14. The SOP manual instructs that TSOs should "carefully" move their hands up the passenger's legs during a pat-down. Pl. Exh. 1 at 18-19; *see* Trial Tr. at 146 (Capone testimony). The term "carefully" is not defined in the manual, but in their training, TSOs are instructed to perform the search in a way that will detect any prohibited items but not injure the passenger. Trial Tr. at 156-57 (Capone testimony); *id*. at 286 (Spinden testimony).

15. When patting down a passenger's leg, the SOP manual instructs that a TSO should place one hand on the passenger's hip and run the other hand up the inside of the leg. *Id*. at 110, 143 (Capone testimony); *id*. at 179-80 (Baker testimony); *id*. at 284-85, 291-92 (Spinden testimony); Pl. Exh. 1 at 18-19.

16. The reason the TSO is supposed to place a hand on the passenger's hip when patting down the leg is to ensure that hidden objects on the hip will be detected. Trial Tr. at 285 (Spinden testimony).

  C.  **The Incident**

17. On March 8, 2017, Stavropoulos arrived at O'Hare Airport at approximately 6:00 a.m. for a work-related flight to Dallas, Texas. *Id*. at 33 (Stavropoulos testimony). His flight was scheduled to depart at 6:50 a.m. *Id*. at 77. Stavropoulos had just a carry-on bag, in which he had his torts book. *Ibid*.

18. At approximately 6:23 a.m., Stavropoulos went through an AIT machine at the TSA checkpoint. *Id*. at 34; *id*. at 197-98 (Baker testimony); Gov't Exh. 8 at 5.

19. The scanner detected an item near Stavropoulos's midsection, thus requiring a pat-down. Trial Tr. at 148, 154 (Capone testimony); Pl. Exh. 1 at 7-8; Gov't Exh. 8 at 4-8. The item

4

was a crumpled dollar bill in the right front pocket of Stavropoulos's jeans. Trial Tr. at 37, 80 (Stavropoulos testimony); *id*. at 149 (Capone testimony); Pl. Exh. 12-1 at 0:14-:18.

20. Dominic Capone was the TSO responsible for patting down Stavropoulos. Trial Tr. at 115-25 (Capone testimony).

21. At the time, Capone was six feet tall and weighed approximately 285 pounds. *Id*. at 102. He had been a TSO for about five months. *Id*. at 114.

22. Less than fifteen seconds elapsed between the time that Capone began giving Stavropoulos the required advisements and the beginning of the pat-down. Pl. Exh. 12-1 at 0:18-:32. That was not enough time for Capone to give Stavropoulos all the required advisements.

23. Capone first searched Stavropoulos's waistband and then patted down his buttocks. Trial Tr. at 123-24 (Capone testimony); Pl. Exh. 12-1 at 0:32-:45.

24. Standing behind Stavropoulos, Capone then searched Stavropoulos's right leg. Trial Tr. at 125 (Capone testimony); Pl. Exh. 12-1 at 0:44-:46. Capone placed both hands around the middle of Stavropoulos's right thigh, commenced an upward movement with both hands, and made contact with Stavropoulos's testicles. Pl. Exh. 12-1 at 0:44-:46. Stavropoulos looked annoyed by the contact with his testicles, but he did not say anything or otherwise move. *Ibid*.

25. Capone repeated those movements while patting down Stavropoulos's left leg, and again made contact with Stavropoulos's testicles. *Id*. at 0:47-:48. Stavropoulos did not make a facial expression or otherwise move on the second contact. *Ibid*.

26. Capone's pat-down did not comply with the SOP manual because he did not give the required advisements and did not keep one hand on Stavropoulos's hip while running the other hand up his leg. Trial Tr. at 107-11 (Capone testimony); *id*. at 291-92 (Spinden testimony).

5

27. After Capone contacted Stavropoulos's testicles the second time, Stavropoulos turned around to confront Capone. Pl. Exh. 12-1 at 0:47-:50. Stavropoulos expressed unhappiness with having his "balls" (Stavropoulos's term) touched. Trial Tr. at 129, 148, 150, 161 (Capone testimony); *id*. at 198 (Baker testimony); *id*. at 253 (Pickens testimony).

28. Stavropoulos pulled up his jeans while confronting Capone. Trial Tr. at 82 (Stavropoulos testimony); Pl. Exh. 12-1 at 0:52-:54.

29. Capone asked Stavropoulos to step to the side to await the arrival of a supervisor. Trial Tr. at 42 (Stavropoulos testimony); *id*. at 130 (Capone testimony); Pl. Exh. 12-1 at 0:55-:57. Stavropoulos complied. Pl. Exh. 12-1 at 0:58-1:00. Stavropoulos stood with a calm look on his face. Trial Tr. at 42 (Stavropoulos testimony); Pl. Exh. 12-1 at 1:00-:10.

30. Stavropoulos did not indicate to Capone that he had suffered an injury or was in severe pain. Trial Tr. at 150-51 (Capone testimony).

31. TSO Jose Barajas arrived on the scene. *Id*. at 46 (Stavropoulos testimony). Stavropoulos complained about Capone's pat-down and asked to file a police report. *Id*. at 47.

32. George Baker, a TSA manager, arrived on the scene. *Id*. at 49; *id*. at 169-70, 180-81 (Baker testimony). Stavropoulos complained to Baker about Capone's pat-down and again asked to file a police report. *Id*. at 50-51 (Stavropoulos testimony).

33. Chicago Police Officer Curry came over. *Id*. at 52-55. Stavropoulos tried to file a police report, in which he would have claimed that Capone assaulted him. *Id*. at 198 (Baker testimony); Gov't Exh. 8 at 5. Curry did not allow Stavropoulos to file the report because Curry believe that an assault had not occurred. Trial Tr. at 198 (Baker testimony); Gov't Exh. 8 at 5.

6

34. During the approximately twenty-eight minutes during which Stavropoulos spoke with Barajas, Baker, and Curry, he stood calmly with his hands crossed at his front or behind his back, without any apparent pain or discomfort. Gov't Exh. 11 at 1:55-30:12.

35. During that period, Stavropoulos stood on his feet and paced around, without leaning over or sitting down or making any attempt to do so. Trial Tr. at 81-90 (Stavropoulos testimony); Gov't Exh. 11 at 1:55-30:12.

36. Stavropoulos did not tell Barajas, Baker, or Curry that he had suffered an injury or was in severe pain. Trial Tr. at 150-51 (Capone testimony); *id*. at 192-93, 199-203 (Baker testimony), *id*. at 242-43 (Pickens testimony); Gov't Exh. 8 at 5-8. Granted, Stavropoulos testified that he told Capone, Barajas, and Baker that he was injured and in pain. Trial Tr. at 49-51, 59 (Stavropoulos testimony). The court does not find that testimony credible, because Stavropoulos does not appear on video to be in any pain, let alone serious pain, and because Capone, Baker, and Pickens credibly testified that the contemporaneous incident report would have noted an asserted injury had a passenger reported one. *Id*. at 150-51 (Capone testimony); *id*. at 192-93, 199-203 (Baker testimony), *id*. at 242-43 (Pickens testimony).

37. At no point while he was at O'Hare Airport did Stavropoulos request medical attention. *Id*. at 83-84 (Stavropoulos testimony).

38. Capone's supervisor, La'Keesha Pickens, completed an incident report shortly after the incident. *Id*. at 194-95 (Baker testimony); *id*. at 223-24 (Pickens testimony); Gov't Exh. 8. Baker reviewed and signed the report. Trial Tr. at 194-95 (Baker testimony); Gov't Exh. 8 at 5. The report does not say that Stavropoulos was injured or claimed to have been injured. Trial Tr. at 199-203 (Baker testimony); Gov't Exh. 8.

39. Barajas performed another pat-down of Stavropoulos, clearing him to enter the secure area of the airport. Trial Tr. at 56, 59 (Stavropoulos testimony); Gov't Exh. 11 at 28:31-30:12. Stavropoulos did not show any visible signs of discomfort during Barajas's pat-down. Gov't Exh. 11 at 28:31-29:33. Stavropoulos testified that he told Barajas to be careful because he was in a lot of pain. Trial Tr. at 59, 96 (Stavropoulos testimony). The court does not find that testimony credible for the reasons given above.

40. Stavropoulos missed his flight to Dallas. *Id*. at 59.

41. The day after the incident, Stavropoulos submitted an online complaint to the TSA. *Id*. at 94-95; Pl. Exh. 7 at 1. The complaint stated that Capone injured Stavropoulos's left testicle, but did not give more detail. Pl. Exh. 7 at 1. The complaint also stated that Stavropoulos had been "unreasonably detained," causing him to miss his flight to Dallas. *Ibid*.

42. On March 20, the TSA responded to the complaint, asserting that it believed its protocols and procedures had been properly followed. Pl. Exh. 7 at 2. The TSA's response criticized Stravropoulos's time management, noting that he likely would have been able to make his flight had he not arrived at the security checkpoint so close to his departure time. Trial Tr. at 95 (Stavropoulos testimony); Pl. Exh. 7 at 2.

43. Two minutes after receiving the TSA's response, Stavropoulos emailed back, saying only, "See you in Federal Court." Trial Tr. at 95 (Stavropoulos testimony); Pl. Exh. 7 at 1-2.

**D. Subsequent Medical Treatment**

44. After leaving O'Hare, Stavropoulos took a taxi to the emergency room at Weiss Memorial Hospital in Chicago. Trial Tr. at 60-61 (Stavropoulos testimony).

45. A physical examination of Stavropoulos's testicles at Weiss did not reveal evidence of testicular pain. *Id*. at 387 (Nadler testimony); Gov't Exh. 9 at 8. Indeed, the physician noted that Stavropoulos's "genital exam [wa]s completely normal." Gov't Exh. 9 at 8.

46. Stavropoulos received a testicular ultrasound at Weiss. Trial Tr. at 327 (Elterman testimony); *id*. at 387-88 (Nadler testimony). The ultrasound did not reveal any testicular trauma, such as a fracture, swelling, hematoma, or inflammation. *Id*. at 327-29 (Elterman testimony); *id*. at 387-88 (Nadler testimony).

47. In March and April 2017, Stavropoulos had several appointments with a Dr. Ainsley at Froedtert Hospital in Milwaukee. *Id*. at 62-63 (Stavropoulos testimony). Dr. Ainsley prescribed ibuprofen after administering an ultrasound. *Id*. at 63.

48. Between April and December 2017, Stavropoulos had several appointments with a Dr. Vourganti at Rush University in Chicago. *Id*. at 64. Dr. Vourganti prescribed ibuprofen and Tylenol and suggested pelvic stretching exercises. *Id*. at 64-65.

49. In August 2017, Stavropoulos saw Dr. Arvin George at the University of Michigan. *Id*. at 66; Gov't Exh. 10 at 1-3. Dr. George suggested a fusion biopsy because of an elevated PSA level. Trial Tr. at 66 (Stavropoulos testimony); Gov't Exh. 10 at 2. That treatment was unrelated to any testicular injury. Trial Tr. at 66-67 (Stavropoulos testimony). A physician assistant's note from that visit stated that Stavropoulos had "[m]inimal discomfort" in his left testicle. Gov't Exh. 10 at 1.

50. In January 2018, Stavropoulos saw Dr. Suzanne Quallich, a urologist and pain specialist, at the University of Michigan. Trial Tr. at 67 (Stavropoulos testimony); Gov't Exh. 10 at 3-7. Dr. Quallich prescribed pain medication. Trial Tr. at 68 (Stavropoulos testimony); Gov't Exh. 10 at 4.

51. Dr. Quallich noted that Stavropoulos's medical history "reveal[ed] very minimal attempts at pain management, despite his reports of pain that interferes with daily activity." Trial

Tr. at 94 (Stavropoulos testimony); Gov't Exh. 10 at 6. She also noted that Stavropoulos's pain "seem[ed] to be neuropathic (rather than urologic) in origin." Gov't Exh. 10 at 6.

52. Stavropoulos had nineteen appointments with Dr. Lev Elterman, a Chicago urologist, starting on January 11, 2018. Trial Tr. at 323-24 (Elterman testimony); Pl. Exh. 14 at 1. Elterman's opinion, which the court finds unpersuasive, is that Stavropoulos's chronic testicular pain was caused by Capone's pat-down on March 8, 2017. Trial Tr. at 326 (Elterman testimony); Pl. Exh. 15 at 1-2. In reaching his opinion, Elterman relied in part on Stavropoulos's non-credible self-report that he had been injured by Capone's pat-down. Trial Tr. at 326-27, 337-38, 344 (Elterman testimony); Pl. Exh. 15 at 1-3.

53. On February 22, 2020, Dr. Elterman performed a spermatic cord block procedure on Stavropoulos. Trial Tr. at 330 (Elterman testimony). A spermatic cord block procedure involves selectively numbing testicular nerves to try to isolate the source of pain. *Id*. at 330-32.

54. Stavropoulos reported significant pain relief after that procedure. *Id*. at 332.

55. Dr. Laurence Levine, a Chicago urologist, performed a cord denervation on Stavropoulos on November 9, 2020. *Id*. at 356 (Levine testimony); Pl. Exh. 17 at 1.

56. A cord denervation procedure involves opening and neutralizing testicular nerves that are not necessary for continuous functioning of the testicle. Trial Tr. at 335-36 (Elterman testimony); *id*. at 358-62 (Levine testimony).

57. A cord denervation is typically performed on patients with idiopathic or neuropathic testicular pain, rather than patients whose pain is caused by trauma. *Id*. at 399 (Nadler testimony).

58. After the cord denervation procedure, Stavropoulos's testicular pain resolved. *Id*. at 333-34 (Elterman testimony); *id*. at 364-66 (Levine testimony). It is unlikely the pain would have resolved without the procedure. *Id*. at 334 (Elterman testimony).

59. Throughout the relevant time frame, Stavropoulos suffered from several medical issues relating to his testicles and prostate, many of which are not alleged to relate to the pat-down on March 8, 2017. *Id*. at 402-03 (Nadler testimony). Those issues includes an elevated PSA level, a prostate lesion, hematospermia (blood in the semen), and an enlarged prostate.

60. There is no evidence that Stavropoulos suffered from left testicular pain prior to March 8, 2017. *Id*. at 437-39.

61. In the opinion of Dr. Robert Nadler, the Government's expert urologist, Stavropoulos's testicular issues were not caused by Capone's pat-down on March 8, 2017. *Id*. at 369, 376-78, 381-403. The court finds Nadler's opinion to be credible given his wealth of experience treating testicular trauma, *id*. at 369-73, because his opinion is consistent with the evaluation (no evidence of trauma or pain, and a normal exam) that Stavropoulos received at Weiss Hospital the day of the pat-down, because his opinion is also consistent with Stavropoulos's minimal reaction to Capone's contacting his testicles during the pat-down—a reaction entirely inconsistent with being in great pain from a severe injury—and because, unlike Dr. Elterman's opinion, Nadler's opinion did not rely on Stavropoulos's non-credible self-report that he had been injured by the pat-down.

62. From March 8, 2017, to the present, Stavropoulos has incurred medical costs totaling $41,845.74 in seeking treatment for left testicular pain. Pl. Exh. 19 at 2.

### E. Additional Medical Background

63. Facial expressions and body language are a reliable indicator for whether an individual is experiencing pain. Trial Tr. at 341 (Elterman testimony)

11

64. A male suffering trauma to a testicle would normally exhibit outward signs of pain or distress. *Id*. at 382 (Nadler testimony).

65. It would be unusual for a person suffering testicular pain the person describes as 8-out-of-10 to show no outward signs of discomfort. *Id*. at 385-86. Stavropoulos testified that Capone's contact with his testicles caused "extreme," "8 out of 10 pain," and that it felt "like being stabbed in [the] left testicle with a knife." *Id*. at 80-81 (Stavropoulos testimony).

66. It would be unusual for a person suffering severe, chronic testicular pain to fail to take prescribed medications. *Id*. at 387, 391-92 (Nadler testimony).

67. It would be unusual for an examination and an ultrasound of a person who has suffered testicular trauma and is experiencing 8-out-of-10 pain to display no objective evidence of that trauma or pain. *Id*. at 389-90.

68. In approximately 25% to 75% of cases, chronic testicular pain (known as "orchialgia") is not due to testicular trauma. *Id*. at 391. Such pain is said to be "idiopathic," meaning the source is unknown, or "neuropathic," meaning that the pain comes from a nerve somewhere in the body, but it is unclear from which nerve. *Id*. at 391, 448-49.

## Conclusions of Law

Illinois tort law governs the substantive issues in this FTCA suit because the incident took place in Illinois. *See Smith v. United States*, 860 F.3d 995, 998 (7th Cir. 2017). "To establish a claim for negligence under Illinois law, a plaintiff must prove the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Swearingen v. Momentive Specialty Chems., Inc.*, 662 F.3d 969, 972 (7th Cir. 2011) (citing *Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011)). The plaintiff bears the burden of establishing each element by a preponderance of the evidence. *See Blue v. Env't*

*Eng'g, Inc.*, 828 N.E.2d 1128, 1142 (Ill. 2005); *State Farm Fire & Cas. Co. v. Welbourne*, 85 N.E.3d 561, 565 (Ill. App. 2017).

Capone owed Stavropoulos a duty of care in the sense that "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012). In the context of TSA pat-downs—especially of sensitive areas of the body—that duty requires TSOs not to use more force than necessary to carry out their security-related tasks. The SOP manual's instruction that pat-downs of sensitive areas be conducted "carefully" embodies the tort duty: a TSO must ensure that there is no forbidden object hidden in a male passenger's groin area, but must perform that check in a way that will not injure the passenger.

Even if Capone slid his hands up Stavropoulos's legs too quickly and without sufficient care, Stavropoulos's negligence claim fails because he has not shown that the pat-down proximately caused any testicular pain he experienced. Under Illinois law, the proximate cause element has "two components: cause in fact and legal cause." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1176 (Ill. 2018). "For cause-in-fact, the plaintiff must show that but for the defendant's conduct, the injury would not have occurred." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018). Stavropoulos has not met his burden to show that, more likely than not, the problems with his testicle would not have occurred but for Capone's conduct during the pat-down on March 8, 2017.

As an initial matter, the court does not find credible Stavropoulos's testimony about the incident. He testified that when Capone contacted his testicle, he experienced 8-out-of-10 pain, akin to being stabbed—and, indeed, he testified that he *had* been stabbed earlier in his life. Trial Tr. at 48, 80-82, 89 (Stavropoulos testimony). Stavropoulos also testified that, during the time

13

he was communicating with various TSA and airport personnel, he continued to experience pain at an 8-out-of-10 level. *Id*. at 85-88.

The video evidence makes it extremely difficult, if not impossible, to credit that testimony. Simply stated, Stavropoulos did not act as if he had been stabbed and was experiencing severe pain that would not subside. He hardly flinched when Capone contacted his groin. He did not fall to the ground, keel over, sit down, or alter his stature in any way; rather, he remained standing upright with a relatively calm expression on his face. The calmness continued during a lengthy series of encounters with airport officials; at no point did Stavropoulos make any sort of physical movement that any person would have made had that person's testicle experienced 8-out-of-10 pain and felt as if it had been stabbed. Moreover, Stavropoulos repeatedly adjusted his jeans *upward*; this, too, is not what one does when experiencing severe testicular pain. Nor did Stavropoulos report to anyone on the scene that he had been injured. Instead, his key concern was that he had been "assaulted." It would be very unusual, to say the least, for a person who has just been struck in the testicle to complain repeatedly about the fact that he had been improperly touched, but to say nothing in the moment about being in severe pain and having just suffered a significant injury.

Although the lack of any contemporaneous show of physical distress by Stavropoulos was among the Government's main points of emphasis at trial, he does little to rebut it. All that he had to say was that he has an unusually high pain tolerance, owing to his experience as a collegiate athlete. Trial Tr. at 47-48 (Stavropoulos testimony). High pain tolerance or not, when the court views the video, it cannot accept that it is viewing a man who is feeling like he was just stabbed in the testicle. And Stavropoulos's lack of credibility on that point casts a substantial and devastating cloud over the whole of his testimony and his case.

14

Also highly probative is the fact that, when Stavropoulos went to the emergency room after leaving O'Hare, his examination did not reveal any testicular trauma. The Government's expert, Dr. Nadler, credibly testified that one would expect to see *some* sort of objective evidence of trauma if Stavropoulos had, earlier that day, been injured by Capone to the extent he claims. That there is no such evidence suggests that whatever the extent of Stavropoulos's testicular issues, they were not caused by Capone's pat-down.

Moreover, Dr. Nadler persuasively opined that Stavropoulos's injuries could not have been caused by Capone's pat-down. Stavropoulos's treaters testified that they had *assumed* the injury was caused by the pat-down, but the basis for their assumption was largely Stavropoulos's non-credible say-so. They did not offer any independent, objective view as to whether it was likely that the injuries occurred in the manner Stavropoulos alleges.

The court recognizes that in the years after the pat-down, Stavropoulos underwent extensive medical treatments and incurred significant medical expenses. But as the plaintiff, it is his burden to present evidence that allows the court to find each element of his claim by a preponderance of the evidence. He has not done so on the proximate causation element. *See Musabelliu v. Gonzales*, 442 F.3d 991, 994 (7th Cir. 2006) ("Post hoc ergo propter hoc is not a good way to prove causation."); *Hussung v. Patel*, 861 N.E.2d 678, 685-86 (Ill. App. 2007) (explaining that a temporal relationship between an event and an injury is insufficient to demonstrate causation). It is therefore unnecessary to analyze the other elements of his claim.

Before concluding, the court notes that Stavropoulos's proposed conclusions of law raise for the first time a new theory of liability: that regardless of *Capone's* negligence, the *United States* breached its duty of care "by not defining in its SOP how to be 'careful' when a TSO moves his hand up on the inner thigh of a male passenger when doing a search of the back of the

legs." Doc. 162 at p. 31, ¶ 25; *see also id.* at p. 32, ¶ 30 ("[I]f the TSA was so concerned about preventing another potential incident similar to that of the Christmas Day bomber, it should have been more definitive in its SOP to give the TSOs some parameters as far as being 'careful' when they moved their hand upward on the inner thigh of a passenger."). It is doubtful that this is a valid theory of liability, given the FTCA's discretionary function exception. *See* 28 U.S.C. § 2680(a); *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014) (explaining that the discretionary function exception to the United States's waiver of sovereign immunity in the FTCA applies when the challenged act "involves an element of judgment or choice" and involves "considerations of public policy") (first quoting *Palay v. United States*, 349 F.3d 418, 427 (7th Cir. 2003); and then quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)). But the court need not resolve that question, since Stavropoulos's failure to show proximate causation dooms his theory in any event. To succeed on that theory, Stavropoulos would have to demonstrate *both* that had the TSA more carefully trained its employees, Capone would not have made contact with his testicles, *and* that if Capone had not contacted his testicles, he would not have suffered the testicular issues he dealt with over the following years. For the reasons already given, Stavropoulos fails at the second step.

## Conclusion

Stavropoulos has failed to carry his burden of showing that his injuries were proximately caused by the (asserted) negligence of the TSA officer who patted him down. The court will therefore enter judgment in favor of the United States and against Stavropoulos.

August 4, 2021

_____
United States District Judge